**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **JOSE LUIS PADILLA POSADAS,**<br><br>Petitioner,<br><br>v.<br><br>**PATRICIA H. HYDE**, Acting Director of U.S. Immigration and Customs Enforcement, Boston Field Office; **TODD LYONS**, Acting Director of U.S. Immigration and Customs Enforcement; **KRISTI NOEM**, Secretary of Homeland Security; **PAMELA BONDI**, U.S.Attorney General; **SIRCE OWEN,** Acting Director, Executive Office for Immigration Review; and **TERESA RILEY,** Chief Immigration Judge, in their official capacities,<br><br>Respondents. | **Case No. 1:26-cv-10276** |

**MOTION FOR FURTHER RELIEF**

**INTRODUCTION**

Petitioner Jose Luis Padilla Posadas ("Mr. Padilla") is a 22-year-old man from Honduras. Since 2021, he has been living and working peacefully in Maine; he has no criminal history whatsoever, and an approved I-360 petition for Special Immigrant Juvenile Status. Mr. Padilla brought this habeas petition after Respondents arrested him without a warrant on January 22, 2026, and held him in mandatory detention. Following an order from this Court, Mr. Padilla has received a portion of the relief he sought: release on bond set by the immigration judge. However, he is still experiencing harm stemming from his warrantless stop and arrest. Specifically, on the day Mr. Padilla was arrested, Respondents terminated his deferred action and employment authorization, without cause and without process. While Mr. Padilla awaits the

adjudication of his application for adjustment of status, therefore, he is vulnerable to additional enforcement actions and unable to work lawfully. Because Respondents' actions violate Mr. Padilla's due process rights and are arbitrary and capricious agency action, Mr. Padilla seeks an order from this Court reinstating his deferred action and related employment authorization.

## FACTUAL AND PROCEDURAL HISTORY

### A. Mr. Padilla arrived in the United States as a child, and took all appropriate steps to apply for lawful status in the United States.

Petitioner Jose Luis Padilla Posadas is a 22-year-old citizen of Honduras. He entered the United States in January 2021, at the age of seventeen, qualifying as an unaccompanied alien child ("UAC"). He was detained by the Office of Refugee Resettlement's Division of Unaccompanied Children Operations briefly before being released to live with his brother in Maine. Since that time, Mr. Padilla has been peacefully living and working in Maine. After finishing school, he started a successful construction business. On or about January 27, 2021, ICE issued Mr. Padilla a Notice to Appear charging him with violations of 8 U.S.C. § 1182(6) and (7) for having entered the United States without proper documentation, and then a Superseding Notice to Appear on July 20, 2021 with the same allegations.

Mr. Padilla promptly sought help from the Immigrant Legal Advocacy Project ("ILAP") in Maine, and set about applying for Special Immigrant Juvenile Status ("SIJS"). On April 11, 2022, the District Court in Portland, Maine, determined that Mr. Padilla's parents had passed away in Honduras when he was eleven years old; that Mr. Padilla went to live with an uncle, who also passed away; and that there was no one to care for Mr. Padilla in Honduras. Further, the Court found that it was in the best interest of Mr. Padilla to continue living with his brother in Maine. Based on the Portland court's order, Mr. Padilla applied for SIJS by filing an I-360 petition with United States Citizenship and Immigration Services ("USCIS") on October 10,

2022. On April 5, 2023, USCIS granted his petition and gave him four years of deferred action. Mr. Padilla received an I-797A Notice of Action, which stated: "USCIS has determined that you warrant a favorable exercise of discretion to receive deferred action. As a result, you have been placed in deferred action and you may be issued an employment authorization document." Ex. 1, I-797A Notice of Action (previously filed as Ex. 2 to the Amended Complaint [ECF No. 9]). The notice also stated: "Your grant of deferred action will remain in effect for a period of four years from the date of this notice unless terminated earlier by USCIS." *Id.* (four years would have ended April 5, 2027). Mr. Padilla also obtained a work permit based on the deferred action, valid until 2027.

Because of the visa backlog impacting SIJS beneficiaries, *see infra*, Mr. Padilla could not immediately apply for lawful permanent resident status after being approved for SIJS, and instead was required to wait until a visa became available to him. Still, he made plans for his future based on his grant of SIJS, his deferred action, and his ability to work lawfully. On January 16, 2024, an immigration judge granted termination of Mr. Padilla's removal proceedings based on *Matter of Coronado-Acevedo,* 28 I&N Dec. 648 (AG 2022), because Mr. Padilla's I-360 petition was approved and he was simply awaiting the opportunity to apply for permanent resident status. On May 14, 2026, Mr. Padilla filed for adjustment of status, as his date for filing applications has become current. Ex. 2, I-485 Receipt.

**B. Respondents arrested Mr. Padilla without a warrant or any Constitutionally sufficient cause.**

Around 7:00 a.m. on January 22, 2026, Mr. Padilla arrived at a private home in Gorham, Maine where he had been hired to do a repair. Ex. 3, Declaration of Jose Luis Padilla Posadas, at ¶ 3. His girlfriend Vanessa Gaitan was with him that day. *Id.* Masked officers approached them, grabbed Vanessa's arm, and asked in English whether he had "a green card or some kind of

permit to be here." *Id.* at ¶ 6. Mr. Padilla responded that he had Special Immigrant status and a work permit, and offered to get his documents out of his car, but the officers arrested him without looking at his documents. *Id.* at ¶ 7. Mr. Padilla recounts: "I don't believe they actually had a warrant for my arrest at that time. The officers didn't even know my name when they first arrived. One of them took my photo with their phone, and somehow pulled up my information that way." *Id.* at ¶ 8.

Mr. Padilla's girlfriend Vanessa Gaitan also remembers that morning. No one else was outside besides Mr. Padilla and Ms. Gaitan. Ex. 4, Declaration of Vanessa Azucena Gaitan Quintanilla, at ¶ 5. Ms. Gaitan remembers a woman officer gripping her arm during the entire encounter, and the officers communicating only in English. *Id.* at ¶¶ 5-7. Ms. Gaitan was not arrested because she showed her green card. *Id.* at ¶ 6. When she asked why Mr. Padilla was being taken, the officers replied that they would be arresting him unless he had a green card. *Id.* at ¶ 9.

After arresting Mr. Padilla, the officers drove him around for over eight hours, without providing him any food. *Id.* at ¶ 10. When Mr. Padilla finally arrived at Respondents' office in Burlington, "the officers told me that my deferred action and employment authorization would be revoked. They didn't tell me why, even though I asked. They just skipped my questions without answering, saying I didn't have permission to be here." *Id.* at ¶ 11. They also provided him a warrant; this is the first time he saw this document. *Id.* at ¶ 12. Further, they gave him a "Termination Notice," dated the same day, January 22, 2026, informing him that USCIS had terminated his deferred action. Ex. 5 (previously filed as Ex. 3 to the Amended Complaint [ECF No. 9]). The notice did not allow Mr. Padilla any opportunity to rebut or respond to the deferred

action termination, although it mentioned submitting "countervailing evidence" for the employment authorization revocation. *Id.*

Respondents held Mr. Padilla in the Burlington office for around three or four days:

> It was really bad there. We were approximately forty men in a small room. We had to sleep there on the floor, no blanket, no pillow, nothing. If you stood up, you wouldn't be able to sit back down again because there were so many people there. There was no shower, and only one toilet and sink for all those people. For food, we were given some kind of microwaved mashed potatoes, and not much of it.

*Id.* at ¶ 13. After that, Respondents transferred Mr. Padilla to Plymouth County Correctional Facility. *Id.* at ¶ 14.

### C. Respondents' account of events differs in material ways, but lacks any facts that could support Fourth Amendment requirements for ***Mr. Padilla's*** stop and arrest or justify the termination of deferred action and employment authorization.

In Burlington, Deportation Officer Joseph Parlon prepared and signed a Form I-213, "Record of Deportable/Inadmissible Alien" for Mr. Padilla. Ex. 6 (previously filed as Ex. 4 to the Amended Complaint [ECF No. 9]). That report indicates:

> January 22, 2026 Officers of the ICE Boston Field Office Fugitive Operations Unit encountered PADILLA POSADAS in Old Orchard Beach, Maine, during "Operation Catch of the Day." Officers identified PADILLA POSADAS through an interview, established alienage, inadmissibility, and did arrest PADILLA POSADAS. Below is the Fugitive Operations Encounter as detailed by one of the Fugitive Operations Team members.
> FUG OPS ENCOUNTER
> On January 22, 2026 as part of Operation Catch of the Day Team I (Officer Manning) was conducting an operation at a construction site located at **1 Palmers Way Old Orchard Beach, ME**, in search of target, LORENZO CRUZ, Yeimi, A209899428. A vehicle registered to her was at the job site. ERO Officers spoke to the **general contractor at the site** and informed him of our intention to arrest the above target. ERO Officers approached the job site and identified themselves and Immigration Officers and made contact with **2 Hispanic males and 1 Hispanic female** at the site and asked for their identification **in Spanish** to find the target alien. All three individuals produced identification and were asked their immigration status. All **stated that they did not have papers** to be in the

> United States legally. All subjects were arrested without issues and transported to ICE office.

I-213 at 2 (emphasis added). The location, number of people involved, language spoken, number of people arrested, and conversation in this report all differed from Mr. Padilla and Ms. Gaitan's account of events.

### D. Mr. Padilla sought habeas relief from this Court and continued the process of seeking permanent lawful immigration status.

On January 22, 2026, Mr. Padilla filed the instant habeas petition with this Court. On February 4, 2026, Mr. Padilla filed an amended complaint including additional allegations that his deferred action and employment authorization had been revoked, and asking this Court to hold those actions unlawful. On February 5, 2026, the Immigration Court held the bond hearing as ordered, and granted Mr. Padilla release on $6,000.00 bond. He was released from custody on February 10, 2026. Mr. Padilla continued working with his ILAP attorney. His renewed removal proceedings were terminated on March 23, 2026, so that he could apply for adjustment of status with USCIS.

In the meantime, Mr. Padilla's ILAP attorney received a "Notice of Intent to Revoke" Mr. Padilla's employment authorization, sent by USCIS on January 28, 2026. Ex. 7. The sole ground for revocation was the January 22, 2026 termination of deferred action. Counsel responded on February 5, 2026, with arguments about why the termination was unlawful, Ex. 8; USCIS has yet to issue any further determination.

/

/

/

/

## LEGAL FRAMEWORK

**I. Respondents lacked any justification for revoking Mr. Padilla's deferred action and employment authorization.**

**1. The background of SIJS Deferred Action shows that the agency was implementing Congress's intent to protect vulnerable youth while they waited for their opportunity to apply for permanent resident status.**

As outlined in Mr. Padilla's Amended Complaint, in March 2022, United States Citizenship and Immigration Services ("USCIS") announced that all young people granted SIJS would be considered for a discretionary grant of deferred action, meaning that they would be protected from deportation while waiting for a visa to become available. In enacting this policy, USCIS itself acknowledged that "Congress likely did not envision that SIJ petitioners would have to wait years before a visa became available."[1] Persons granted deferred action are shielded from deportation and are eligible to apply for employment authorization under 8 C.F.R. § 274a.12(c)(14). *See also Reno v. Am.-Arab Anti-Discrimination Comm. ("AADC")*, 525 U.S. 471, 484, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) ("Approval of deferred action status means that, for ... humanitarian reasons[,] ... no action will thereafter be taken to proceed against an apparently deportable alien, even on grounds normally regarded as aggravated.") (internal citation omitted).

Importantly, "USCIS has the sole authority to grant and terminate deferred action for noncitizens with SIJS classification."[2] And, generally, USCIS may only terminate deferred

---

[1] USCIS, Policy Alert PA-2022-10 at 1 (Mar. 7, 2022), available at: https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20220307-SIJAndDeferredAction.pdf ("2022 Policy Alert"); *see also* USCIS, Training regarding SIJ Deferred Action Background, available at: https://www.ilrc.org/sites/default/files/2025-09/FOIA%20Results%20on%20SIJS%20Deferred%20Action%20Policy.pdf at 11–12.

[2] USCIS Memo re: Special Immigrant Juvenile (SIJ) Deferred Action, June 26, 2023, available at: https://www.ilrc.org/sites/default/files/2025-09/FOIA%20Results%20on%20SIJS%20Deferred%20Action%20Policy.pdf at 131–132.

action "if the SIJ-classified individual was not eligible at the time of the initial grant of deferred action, the SIJ Form I-360 is revoked, or if they are no longer eligible based on new information." *Id*. In June 2025, USCIS rescinded the SIJS deferred action policy, deciding to no longer consider granting deferred action to SIJS youth waiting to apply for a green card. However, this policy change has *no impact* on SIJS beneficiaries who already received deferred action. USCIS Policy Alert, PA-2025-07, "Special Immigrant Juvenile Classification and Deferred Action" (June 6, 2025), available at: 20250606-SIJDeferredAction.pdf (stating that noncitizen "with current deferred action based on their SIJ classification will generally retain this deferred action . . . until the current validity periods expire."). Further, the Eastern District of New York has granted a stay of the rescission of this policy. *A.C.R. et al. v. Noem et al.,* 1:25-cv-03962-EK-TAM (E.D.N.Y., Nov. 19, 2025).

Deferred action is an act of prosecutorial discretion that defers efforts to deport a noncitizen from the United States for a certain period of time. In the case of SIJS recipients awaiting visas, USCIS granted deferred action for a period of four years. *See id*. Deferred action does not confer lawful status and does not prevent an immigration judge from issuing a removal order. However, unless and until terminated, a grant of deferred action prevents immigration authorities from physically removing a noncitizen from the United States. USCIS Policy Manual, Vol. 6: Immigrants, Part J: Special Immigration Juveniles, Ch. 4: Adjudication; *Reno v. Am.-Arab Anti-Discrimination Comm*., 525 U.S. 471, 484 (1999) ("*AADC*").

**2. Respondents' happenstance termination of Mr. Padilla's deferred action and associated employment authorization violated his right to due process.**

Once deferred action is granted, fundamental procedural due process protections attach to the recipient, such as the right to notice and an opportunity to contest the revocation of deferred action. *See Maldonado v. Noem*, No. 4:25-CV-2541, 2025 WL 1593133, at *2 (S.D. Tex. June 5,

2025) (finding that Petitioner was "likely to succeed on his Due Process claim" because he was denied "notice, a hearing, or any opportunity to contest the revocation of his deferred action"). In detaining Mr. Padilla without "considering the effect of his deferred action on his potential removability, the government's actions implicate fundamental due process concerns." *Nevarez Jurado v. Freden*, 813 F. Supp. 3d 376, 388 (W.D.N.Y. 2025) (citing *Maldonado v. Noem*, 2025 WL 1593133, at *2 (S.D. Tex. June 5, 2025) (detention and "possible imminent deportation" of individual with grant of deferred action without a hearing "appear[ed] to be a procedural due process violation")). The *Nevarez Jurado* court emphasized the importance of reliance on deferred action:

> Stated another way, if government prosecutors simply decided not to take immediate action to deport Nevarez Jurado while reserving their ability to change their minds whenever they wanted, why make explicit findings that he was not a risk and that he deserved favorable consideration? Why tell him? Why not simply defer now and take action to deport him whenever they chose to do so? Why tell Nevarez Jurado that his removal will be deferred for four years and thus encourage him to stay in this country? And why not at least tell him that staying here would carry a risk that they might change their minds willy nilly and arrest him—a risk about which he would undoubtedly be unaware?

813 F. Supp. 3d at 387–88.

The "grant of SIJ status, deferred action and work authorization constitute important benefits such that revocation would constitute 'cognizable prejudice.'" *Garcia Lanza v. Noem*, No. 26-0029 (GRB), 2026 WL 585130, at *7 (E.D.N.Y. Mar. 3, 2026) (citing *Nevarez Jurado v. Freden*, No. 25-CV-943 (LJV), 2025 WL 3687264, at *10 (W.D.N.Y. Dec. 19, 2025) (finding, under *Mathews*, that "the government [does not have] free [rein] to detain a deferred action recipient without a pre-detention hearing or individualized determination.") (additional citations omitted). *See also Primero v. Mattivelo*, No. 1:25-CV-11442-IT, 2025 WL 1899115, at *5 (D. Mass. July 9, 2025) (finding mandatory detention without bond under 8 U.S.C. § 1231 unjustified where

immigrant had SIJS and deferred action). However, Respondents have apparently ignored deferred action in other cases when deciding to detain noncitizens. *See, e.g., Chuqui Paredes v. Moniz,* No. CV 26-10335-FDS, 2026 WL 309632, at *2 (D. Mass. Feb. 5, 2026) (noncitizen with approved SIJS petition and deferred action was detained by ICE); *Sena Gomes v. Wesling,* No. 25-CV-13727-FDS, 2025 WL 3636712, at *1–2 (D. Mass. Dec. 16, 2025) (same); *Dondoni v. Moniz*, No. 1:25-CV-13438-IT, 2025 WL 3470501, at *1 (D. Mass. Dec. 3, 2025) (same). For all these reasons, Mr. Padilla was injured when Respondents revoked his deferred action and employment authorization.

**3. Respondents' termination of Mr. Padilla's deferred action and employment authorization is arbitrary and capricious action prohibited by the APA.**

There has been no change in Mr. Padilla's circumstances that would warrant revocation of his deferred action and work permit; Respondents simply decided to revoke it, opportunistically and after the fact, on the day they detained him. Respondents have not, and can not, provide any rationale for terminating Mr. Padilla's deferred action. Agency action is arbitrary and capricious where it lacks a "rational connection between the facts found and the choice made." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221, 136 S.Ct. 2117, 195 L.Ed.2d 382 (2016). As in *Garcia Lanza*, the revocation of "deferred action and work authorization appears to have been pretextual and retaliatory: the only evidence as to the impetus for these decisions was an effort to rationalize his illegal arrest and detention." No. 26-0029 (GRB), 2026 WL 585130, at *8. Here, it was unlawful for Respondents to terminate Mr. Padilla's deferred action solely because they wanted to detain him. To hold otherwise would render deferred action meaningless.

/

/

**II. As Respondents' stop and detention of Mr. Padilla were unlawful, the revocation of deferred action and employment authorization that flowed from that stop and detention were also unlawful.**

Respondents' treatment of Mr. Padilla indicates that they view him solely as a "Hispanic male," indistinguishable as a fish caught in a giant net. Respondents cannot provide, because they do not have, a *pre-arrest* warrant or any other justification for reasonable suspicion to stop Mr. Padilla. At the time they arrived at the home in Gorham, they did not know anything about Mr. Padilla, not even his name. Before asking any questions, the officers began the encounter by gripping Ms. Gaitan's arm – a clear signal that Mr. Padilla and Ms. Gaitan were not free to leave. Further, the officers did not have probable cause to arrest Mr. Padilla, because they did not pause to establish whether he had deferred action or any other lawful status. It is true that immigration officers may make warrantless arrests of individuals "likely to escape before a warrant can be obtained," 8 U.S.C. § 1357, but there is no indication that Mr. Padilla was likely to escape. Respondents' actions on January 22, therefore, violated the Fourth Amendment.

None of the accounts of the arrest provide reasonable suspicion or probable cause or any indication that Mr. Padilla tried to escape. Immigration stops are "subject to the same Fourth Amendment requirements that apply to other stops and arrests—reasonable suspicion for a brief stop, and probable cause for any further arrest and detention." *Morales v. Chadbourne*, 793 F.3d 208, 215 (1st Cir. 2015). An officer's perception of an individual's ancestry or ethnicity alone, without more, cannot support reasonable suspicion. *Vasquez Perdomo v. Noem*, 606 U.S. ___ 5-6 (Sep. 8, 2025) (Kavanaugh, J., concurring); *see also U.S. v. Ramos*, 591 F.Supp.2d 93, 105-106 (D. Mass. 2008) (collecting cases). In finding justification for Mr. Vasquez Perdomo's stop, the Supreme Court looked to the totality of the circumstances, including

> that there is an extremely high number and percentage of illegal immigrants in the Los Angeles area; that those individuals tend to gather in certain locations

> to seek daily work; that those individuals often work in certain kinds of jobs, such as day labor, landscaping, agriculture, and construction, that do not require paperwork and are therefore especially attractive to illegal immigrants; and that many of those illegally in the Los Angeles area come from Mexico or Central America and do not speak much English.

*Id.* The facts here are as disparate as they can be. Upon information and belief, there is an *extremely low* number or percentage of undocumented people in the Gorham, Maine area. Mr. Padilla and Ms. Gaitan were at a private home, not gathered with others to seek daily work. Both Mr. Padilla and Ms. Gaitam speak fluent English. Tellingly, the officers did not say anything to Mr. Padilla or Ms. Gaitam before grabbing them and asking to see their documents. Nor did the officers accurately document their actions that morning.

Precedents from this Court and the First Circuit align with this rationale. An officer "must be able to articulate something more than an inchoate and unparticularized suspicion or 'hunch'" to justify an immigration stop. *U.S. v. Espinoza*, 433 F.Supp.2d 186, 190 (D. Mass. 2006) (quoting *United States v. Maguire*, 359 F.3d, 71, 76 (1st Cir.2004) and *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)); additional citations omitted). As the officers did not know anything about Mr. Padilla or Ms. Gaitan at the time they stopped them, and as they have provided no information indicating otherwise, they have not met their burden for showing good cause for the stop and arrest.

Had the officers checked, and followed the law, Mr. Padilla's grant of deferred action should have accorded him protection against detention. As another court recently noted in a similar case, "having been awarded SIJ status, deferred action and work authorization, and with no removal proceeding having been commenced, the petitioner **simply was not subject to arrest."** *Garcia Lanza v. Noem*, No. 26-0029 (GRB), 2026 WL 585130, at *6 (E.D.N.Y. Mar. 3, 2026) (granting release from detention and vacating revocation of deferred action and employment authorization;

emphasis added). This is yet another reason that Mr. Padilla should never have been arrested at all.

**III. Relief Requested**

Because Respondents' actions were unconstitutional and unlawful, the Court should vacate the revocations and put Mr. Padilla back in his pre-detention position: protected by deferred action and authorized to work, while he awaits adjudication of his application for permanent resident status.

Dated: June 4, 2026

Respectfully submitted,
Attorney for Petitioner,

/s/ Stephanie E.Y. Marzouk
Stephanie E.Y. Marzouk MA BBO#683291
Marzouk Law LLC
2464 Massachusetts Ave Ste 317
Cambridge, MA 02140
Tel: 617-674-2112
Email: sym@marzouklaw.com

**CERTIFICATION OF L.R. 7.1 COMPLIANCE**

Pursuant to Local Rule 7.1(a)(2), I conferred with counsel for the Respondents in an attempt to narrow the issues. Counsel indicated that Respondents would oppose this motion.

s/*Stephanie E.Y. Marzouk*
Stephanie E.Y. Marzouk

**CERTIFICATE OF SERVICE**

I certify that on June 4, 2026, I electronically filed the foregoing document in the Court's CM/ECF system, and that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/*Stephanie E.Y. Marzouk*
Stephanie E.Y. Marzouk